It is Leal v. Adamson, 24-4594. I'll give you two minutes when you come back up, counsel. Good morning. May it please the Court. I'm Ryan Norwood representing Mr. Leal. If I could start by answering your last question. There was actually a lot of discovery that was conducted in this case before it was stayed for this appeal. There were documents provided by both sides. There were two depositions done of defendants, Lansman and Augustin. And there were experts. Which, Augustin and who was the first? Dr. Lansman. Lansman, okay. And there were actually experts noticed by both sides. We provided a report. It's in the record because I put it there when we were arguing over the stay where the doctor, our doctor, had reviewed the records and determined that the course of treatment was medically unacceptable under the circumstances. So what other discovery do you think would need to be taken if the case is allowed to proceed? When the case was stayed, what we had pending was a notice deposition of their rebuttal expert and some interrogatories that were before the individual members of the URC in part to determine how they actually voted. I believe there was another notice deposition regarding another. Have you received, like, records from the URC? Do you already have all those documents? We got discovery, again, that included the names of the URC members, but not, like, a record of how they actually voted. Or the materials they reviewed in making that vote, things like that you think you still need?  Correct. No, we still don't have that. I mean, it's still not a complete record. We came, we made some significant progress towards completing it, but there are still a few things that need to be done. Quite frankly, I think it would have been easier if we had just completed that discovery rather than come up here for this interlocutory appeal. I mean, one of the things about this case, you know, is kind of, there's a lot of people, and then it progresses along a timeline, and presumably your argument is as things went on, it got worse and worse because the more time that went by, the more deliberate and different people were. I mean, that's just kind of the nature of a case like this. Early on in the case, you have some doctors that are looking at him, but they only see him briefly. Like Dr. Pena, Dr. Sanchez, I believe, is one, Dr. Pena, maybe. So why is there a deliberate indifference claim as to them? I believe our allegations are somewhat broader than that. It's true that in the complaint we refer specifically to one visit by Dr. Sanchez and one visit by Dr. Pena, but it is specifically alleged that they were responsible for Mr. Leal's care during this early period, and we're talking about a period of months here. Do you think you have a complete record of all the times Dr. Sanchez saw your client? I'm not sure that we do, and that's, again, another thing that we might want to fully develop in discovery here. We are alleging what we knew at the point that we submitted the complaint about these two specific visits, but we are more broadly alleging that they were responsible for their care. So I'm not agreeing at this point that that's the only time that they were in a position to provide medical care for Mr. Leal. Another point I want to make about these progressive providers is that there's a record that's available to them. We specifically allege this, that there's a record of complaints made by Mr. Leal that would have been available to the subsequent providers. That's why I'm a little confused about your response to Judge Bress's question, is that considerable discovery has been done, and I guess I'm envisioning, you know, a patient file where you'd be able to see which physician saw him when and how many times. Is that maintained electronically? Most of their files are not. They're on paper, and I receive copies of them in a PDF form. Frankly, they are very hard to read. A lot of it's handwritten, so even when I get the record, it's not always clear exactly who was doing what when. That's in part why we sought depositions of some of the providers to clarify and to, frankly, interpret some of the stuff that's in the record here, because you can't read a lot. But just a couple of other issues that came up that I'd like to address in my time. Defendants brought up the State law claims. There were State law claims pled. They were not the subject of the motion to dismiss. I mentioned in my- In front of us, right? No, they're certainly not. I would argue that they've been, that the motion to dismiss has been waived at this point.   I take yes for an answer on that one. They're not in front of us. Yes. Okay. Is there another matter you wanted to raise? Just briefly, the Estelle case was mentioned. I wanted to point out that that's a very different factual circumstance involved there. Estelle noted that in that case, that the plaintiff had acknowledged that he received extensive medical care, and that what he was alleging there amounted to, did amount to just a difference in a disagreement about treatment. That's not what's alleged here. This Court has never interpreted Estelle to mean that just because you get some care, there's no deliberate indifference because it falls into a disagreement. I think that does get into kind of the crux of the case a little bit, which is that we're here on 12B6, so it's a favorable standard to you. On the other hand, the deliberate indifference standard is a hard one. In a lot of these cases, just in candor, you see maybe more deliberate indifference than what's alleged here because he has a consistent pattern of treatment. There's an allegation that the treatment wasn't working, but at the end of the timeline, we find out he has an MRI that reveals a congenital defect, and it's not apparent what, from the face of the complaint, exactly what more one is claiming could have reasonably been done. And when you have a series of kind of ongoing review and ongoing doctors, it just may create some impediments to actually proving up this claim under the legal standards. I mean, I will agree with you that deliberate indifference is not supposed to be an easy standard to meet, but, you know, it just comes back to this is not the proper stage of the proceedings to be trying to resolve these questions. But you agree you're going to have to show you've allayed. Your client's going to — it is a tall order. You'll have to prove, right, that there was actually an exacerbation of the injury because of the delay. The delay alone is not going to be enough, right? I think that's pretty well established. I would need to — And you've alleged it. The complaint alleges it. I'll give you that. And my understanding, and this is kind of important given opposing counsel's comments, it's important to me anyway, that this is not a claim that is dependent upon difference of opinion about whether or when an MRI was warranted. The allegation, or at least it's not limited to that. The allegation in the complaint is that for this very, very persistent back pain that became symptomatic after this particular injury, that there was a different course of treatment that would have been called for. So that's going to require expert testimony. We don't have that yet. But that's where I'm seeing the trajectory of this case going. Do we have a difference of opinion on that? I agree with you that if at the end of the day we're only able to show that there's a reasonable difference of opinion, then that's not going to meet the standard. But what we're alleging here is that the failure to give the MRI was medically unacceptable under the circumstances. Because it became, as Judge Bress said, because this went on and on and on. It's one of the reasons, yes. Right. Well, that's why I think he and I both are calling your attention to Dr. Sanchez, who from what we can tell only saw the plaintiff one time and within the first month after the injury, maybe two months or six weeks or so after the injury. So that's really tough to show deliberate indifference. I would agree if we're ranking people. You know, as far as, say, you know, Dr. Augustin, who saw Mr. Leal numerous times over the course of the year before he finally referred him to the orthopedist, that there might be a difference there. But that doesn't mean that it couldn't meet. It's not implausible that it could meet the deliberate indifference standard. I would respect that. I think it is implausible if he only saw him the one time. Hence my question. I think we both asked the question. Was he seen again?  Yeah, the same with Pena. I mean, we just wouldn't want to keep people in a case if there's not a fair allegation against them. And some of these doctors, there's very limited mention of them in the complaint. I mean, with Dr. Pena, again, he would have the benefit of Dr. Sanchez, who I believe was the first. Maybe I have the order mixed up. Dr. Pena saw him first. He saw him on September 4th, so right after the injury. He's the one who ordered an X-ray of the foot. Because apparently there are other potential injuries there, but not an X-ray of the back. And then Dr. Sanchez saw him on October 10th. I understand what you're saying, and I understand the concern. But my respectful view is that they should stay in the case at this point under the 12B6 standard, and if we're ultimately unable to show after discovery is completed that there was deliberate indifference, that would be the proper time to remove them. Okay, thank you. If I may, have those doctors been deposed? No, they haven't. Is it your intention to do that? I might do so, yes. Yes. I think if we would want to keep them in the case, it would be important to get more information. Can I ask you one last question? So how about the warden? I mean, the warden is not a doctor. So what is the basis for the warden being deliberately indifferent? There are some very specific allegations by Mr. Leal that he specifically notified the warden of the ongoing situation in person once and in writing on another time. There is case law holding that a warden can be responsible under some circumstances for knowledge, given the specific allegations that we have here. Further? So just personal curiosity, I guess. Why is the Federal Public Defender doing a 1983 action? Is that normal? No, it's not normal. We represented Mr. Leal in another action. The court ruled that this proceeding was ancillary to it and appointed us. It was a habeas action? You guys represented him in another habeas action, and 1983 is ancillary to that? So the district court appointed you for this?  How often do you do 1983 actions? Not very often. Okay. Interesting. Thank you for your patience with our questions. We'll give opposing counsel two minutes. Thank you, Your Honors. There's been some discussion about the difference between summary judgment standard and the motion to dismiss standard. And I think that the Court should remember that the principal difference between summary judgment and the motion to dismiss is at summary judgment, there has to be evidence. At the motion to dismiss standard, there has to be — there only has to be allegations. There doesn't have to be evidence. But there still has to be allegations. Counsel, this is an extraordinary record that we have here. In the district court, there was a motion filed by the State. It's page 11 in particular, where there was a citation in the State's brief to an online article from the Cleveland Health Clinic. And it was cited, page 11, the State argued congenital narrowing of the spinal column is genetic, meaning it is not part of the normal biological process and was not caused by the defendants.  It's entirely extraordinary that the State would be making that argument in response to a 12b-6 and trying to — and then argued later that we should take judicial notice of the article, sir. So I'm a little aghast that you're reminding us of the standard 12b-6 in summary judgment, which we're very mindful of. Well, Your Honor, I'm just trying to counter the argument because it's not alleged in the complaint either that they were trying to make the argument, they were trying to speculate what the congenital narrowing of the — But we don't know all — and we certainly don't. Right. And that's kind of the point I was making there. We just know that he's alleged. We just know that he's alleged that he had an injury. And then this became symptomatic. That's all we've got. And then the other thing I would like to remind the Court of is that — well, correct me if I misstate, but Estelle was not about extensive health care. The only thing they did at Estelle was is they gave pain medication. They didn't order x-rays. They didn't do anything else. That's the only allegations in Estelle. So I think Estelle is full on port. And the other thing I'd like to remind the Court is, is that these are individual defendants. You can't collectively sue them and say, hey, you know, this doctor, over the course of the year, we're looking at this. And so if we look at all of the care he got, then we're going to say it's deliberate indifference. But what you have to do is what the individual doctors did. And you have people like a doctor who ordered the x-ray and MRI, and they're suing him. I think the Court's pointed out that the warden is not a doctor. The medical records, if he even could understand and review them, they would have come up and said, hey, the panel has already made a decision. I can't overwrite the panel's decision. You've got early doctors who couldn't possibly have anything. And finally, you have Dr. Augustin, who orders orthopedic surgery, who they admit. Well, you're well over time. Thank you. I'm going to ask you to stop there. Thank you both for your arguments. We'll take that matter under advisement.
judges: CHRISTEN, BRESS, VANDYKE